**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH PROVENZANO,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:18-997** |
| **v.** | : | **JUDGE MANNION** |
| **RLS LOGISTICS, RLS COLD STORAGE, BILL JOZEFOWICZ, LORI COGIT, and ANTHONY LEO,** | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Pending before the court, in this disability discrimination action filed by plaintiff Joseph Provenzano, is a motion for summary judgment pursuant to Fed.R.Civ.P. 56 filed by defendants RLS Logistics, RLS Cold Storage, Inc., Bill Jozefowicz, Lori Cogit, and Anthony Leo ("RLS" or "defendants"). (Doc. 37). Plaintiff, formerly a Senior Supervisor with RLS at its Pittston, PA, warehouse, alleges that he was unlawfully demoted due to his disability and that RLS failed to accommodate his disability, which forced him to quit his job (i.e., he was constructively discharged). Plaintiff also alleges RLS retaliated against him and interfered with his FMLA leave. Based upon the court's review of the briefs and related materials, the defendants' motion will

be **GRANTED** with respect to all of plaintiff's federal claims and his identical PHRA claims. Plaintiff was unqualified and could not perform the essential functions of his job. RLS did not take any adverse action against plaintiff. There is no genuine issue for trial with respect to plaintiff's failure to accommodate and retaliation claims against the defendants. Also, since all of plaintiff's federal claims fail, the court will **DECLINE** to exercise supplemental jurisdiction over his state law intentional infliction of emotional distress ("IIED") claim.

## I.    BACKGROUND

The plaintiff filed a second amended complaint ("SAC"), (Doc. 17), on May 17, 2019. Plaintiff raises a claim of interference with his rights under the Family Medical Leave Act, 29 U.S.C. §2601, *et. seq.* ("FMLA"), in Count One, as well as an FMLA retaliation claim in Count Two. Both FMLA claims are raised against all defendants. In Count Three, plaintiff raises a state law IIED against all defendants. Plaintiff also alleges disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101, *et seq.*, as well as retaliation under the ADA, Counts Four and Five, respectively. In Count Six, plaintiff asserts a failure to accommodate claim under the ADA.

2

Plaintiff raises his ADA claims only against RLS Logistics and RLS Cold Storage. In Count Seven, plaintiff raises a disability discrimination claim, and in Count Eight, a retaliation claim, against all defendants under the Pennsylvania Human Relations Act, ("PHRA"), 43 P.S. §951, *et seq.*[1] In Count Nine, plaintiff asserts a failure to accommodate claim against all defendants under the PHRA.

As relief, plaintiff seeks declaratory relief under 28 U.S.C. §§2201, *et seq.*, asking the court to declare that defendants' alleged practices and policies were discriminatory and in violation of the ADA and FMLA. Further, plaintiff seeks various forms of monetary relief against defendants, including back pay and front pay as well as compensatory and punitive damages.

After completing discovery, the defendants filed a motion for summary judgment with respect to all of plaintiff's claims, pursuant to Fed. R. Civ. P. 56,[2] on December 20, 2019. (Doc. 37). The motion was then briefed. Also,

---

[1]ADA and PHRA claims are analyzed under the same standard. *See* Kelly v. Drexel Univ., 94 F.3d 102 (3d Cir. 1996). As such, the court will discuss all of the plaintiff's ADA and PHRA claims together.

[2]Since both parties state the correct standard of review applicable to a summary judgment motion, the court will not repeat it. Suffice to say that to prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact and, that the court must consider all evidence and

defendants filed a statement of material facts and plaintiff filed a response, which included a counterstatement of facts. Defendants responded to the counterstatement of facts. Further, the parties filed exhibits.

This court's jurisdiction over the plaintiff's federal claims is based on 28 U.S.C. §1331. The court can exercise supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. §1337.

## II.    MATERIAL FACTS[3]

1. Plaintiff's Employment with RLS

The undisputed facts, as supported by the record, establish that the plaintiff was hired in 2011 by RLS at its cold storage facilities in Pittston, PA, as a warehouse associate. In February 2016, he was promoted to Supervisor.

---

inferences drawn therefrom in the light most favorable to the non-moving party. *See* Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

[3] The court notes that it only includes relevant material factual statements with support in the record. Legal arguments and conclusions are not included. Nor are extraneous facts included.

Further, as discussed below, the court does not consider plaintiff's Declaration, (Doc. 51-1), submitted after his deposition based on the Sham Affidavit Doctrine.

Cogit is Vice President of Human Resources for RLS. Leo is the CEO and President for the RLS Warehouse Group. Jozefowicz is the VP of Operations for RLS, and he spent 40% of his day on the floor, which included in the freezers.

RLS provides cold storage and third-party logistics services involving temperature-regulated storing product, regulating temperature for storing product, storing cold/freezing and refrigerated items in freezers located on a campus consisting of three buildings. When RLS receives shipments of frozen food products from its customers, it stores the products in its freezers until they are needed by the customers. RLS then loads the frozen products on its customers' trucks.

The freezers used by RLS had a temperature range between negative 10 and negative 30 degrees, Fahrenheit. The temperature on the loading docks is generally between 28 and 34 degrees, Fahrenheit. RLS's facility also had a "dry product" area where product that did not need to be refrigerated was stored, and which would stay at "room temperature", i.e., 50-60 degrees Fahrenheit.

As Supervisor in 2016, plaintiff's job duties included: designate trucks; work with staff on getting orders picked and loaded on the trucks; walk

5

through the freezer and the warehouse and check on the staff's work; oversee the office staff; and attend meetings.

In about May of 2017, RLS promoted plaintiff to Senior Supervisor ("SS"). In this position, plaintiff retained his duties as Supervisor but he also had more responsibility and was required to attend more meetings. In particular, plaintiff spent 35-45 minutes in daily meetings. Manager meetings were held weekly or biweekly. Plaintiff also received more pay, namely, a $7,800 per year raise, as Senior Supervisor. Plaintiff was a salaried employee.

Most of plaintiff's duties involved numerous routine walk-throughs in the warehouse and the freezers in order to supervise the work being performed by the staff who were part of his team. Plaintiff supervised RLS's warehouse staff as they loaded, unloaded, inventoried and stored frozen food products of RLS's customers in large walk-in freezers kept well below 32 degrees Fahrenheit. Plaintiff supervised 20-25 employees and he had to direct his subordinates to make sure the required work was being performed. In fact, plaintiff could not supervise staff without going into the freezers since the primary operation of RLS was providing cold storage for its customers' products. Plaintiff had to conduct his walk-throughs in the three buildings

6

located on RLS's campus to check on his team and assist them. Specifically, plaintiff would conduct 5-7 walk-throughs daily for Building 1, more than 3 walk-throughs for Building 2, and 3 walk-throughs for Building 3. Plaintiff admitted that he spent at least half of his day walking through the freezers observing the work of his subordinates, and that this was an essential function of his position. Plaintiff admitted that as a Senior Supervisor it was not possible for him to do his job without entering the freezers. Plaintiff also performed some of his daily work in heated offices around the campus.

Indeed, plaintiff's daily work involved a lot of walking from building to building on the campus as well as going into and out of the freezers. Plaintiff admitted that he typically was moving from the time he got to work until the time he left.

With regard to the specifics of plaintiff's Senior Supervisor job, it required the person to "consistently work in the warehouse with temperatures at 0 degrees F", as well as light lifting, and the ability to stand 2-4 hours per day. A forklift certification was also required for plaintiff's supervisory positions and plaintiff occasionally operated a forklift as part of his duties. However, supervisors did not operate forklifts on a regular basis, rather they did so when needed to assist the staff.

7

Additionally, in both of his supervisory positions, plaintiff was required to perform several and "broad" job duties which are listed in RLS's SMF and are not repeated herein. (*See* Doc. 37-1 at 6-8). Plaintiff tried to balance his office duties with his duties of overseeing the staff's work.

Plaintiff used a tablet computer RLS provided to him to assist him with his duties so he could be more mobile when he was going into the freezers and checking on staff working on the docks. Plaintiff estimated that he spent half of his day in the freezers and on the docks as well as other areas of the facility, and half in his office, and that he tried to maintain a balance. However, during a 10-hour shift, plaintiff actually had to be in the freezers or on the docks about 7-8 hours. In fact, Leo expected his Senior Supervisors to spend 80-90% of their time in the freezers and on the docks, and indicated that the majority of a supervisor's job was not desk work in the office.

Plaintiff also performed duties as Senior Supervisor that did not require him to be in the freezers, and his duties also included monitoring his staff through a system called WMS which he accessed through a computer.

**2.** Warehouse Manager Position

Prior to plaintiff's promotion as Senior Supervisor, the position of Warehouse Manager became vacant at RLS's Pittston facility in November

of 2016. During the beginning of Spring in 2017, RLS began to look to fill the vacant Warehouse Manager position to assist Jozefowicz who was getting spread too thin regarding his tasks.

RLS did not think plaintiff was qualified for the Warehouse Manager position since he lacked the skillset and experience with respect to the duties of the position which required dealing with customers. RLS concluded that plaintiff was not qualified for the position since he required "more emotional intelligence" and "more experience learning how to manage", as well as more "customer-facing" experience. RLS also found that plaintiff did not have the communication skills and general skills required for the Manager's duty of interfacing with customers. RLS concluded that plaintiff was not qualified for the Warehouse Manager position in May or June of 2017, a few months before plaintiff was diagnosed with cancer in September of 2017.

Thus, RLS decided to search for a Warehouse Manager from outside of its employees. Jozefowicz first checked with his industry contacts to look for a candidate for the position. However, this attempt was not successful and RLS hired a recruiter to assist it to fill the position. In October of 2017, RLS hired Gabe Goldstein as the Warehouse Manager, who was an outside candidate. However, as Senior Supervisor, plaintiff was paid a higher salary

9

than the Warehouse Manager and Plaintiff was promoted to Senior Supervisor soon after the Warehouse Manager position became vacant.

3. Plaintiff's Medical Condition

On August 31, 2017 through September 3, 2017, plaintiff was hospitalized and diagnosed with colon cancer. He was 33 years old at the time.

On September 5, 2017, plaintiff returned to work and requested RLS to accommodate his condition by allowing him to go to radiation treatment five days per week for about one hour during September and October of 2017, as well as attend doctor's appointments. Plaintiff also informed Jozefowicz that he would need access to a bathroom due to the radiation treatments and Jozefowicz told him he did not need permission to use the bathroom. However, plaintiff stated that even though RLS knew that he suffered from fecal incontinence, it assigned him to work in an area that was about a three minute walk to the bathroom despite the fact that other areas of the facility were only about a one minute walk to a bathroom. Notwithstanding the approximate two minute difference in walking distance, plaintiff was told he could freely use the bathroom when he needed to.

10

Plaintiff did not inform RLS of any other accommodations he required at the time of his treatments. RLS granted plaintiff the accommodations despite the fact that at times, plaintiff would not be able to return to work after his treatments. At times, plaintiff would return to work in the evenings after receiving treatments. Plaintiff stated that he worked at least 35 hours per week even during his radiation treatments, counting alleged unrecorded hours he worked in the evenings. However, RLS's records indicated that during plaintiff's treatments from mid-September to mid-October, he worked at least 20.95 hours per week. RLS also offered to allow plaintiff to take intermittent FMLA leave for his treatments, however he declined since he wanted to save his FMLA leave for his upcoming surgery.

4. Plaintiff's Job Duties After His Cancer Diagnosis

After his cancer diagnosis from September through November of 2017, plaintiff's job duties as Senior Supervisor did not change and he estimated that he would still spend about half of his day in the freezers. However, due to his treatments, the cold became a problem for plaintiff. Nonetheless, plaintiff's supervisors, Leo, Jozefowicz and Goldstein, informed plaintiff that he was not demoted. However, plaintiff contends that he was demoted to perform manual labor as "operational support" when he was undergoing

11

chemotherapy and that he was only sometimes performing his previous duties.

When plaintiff had to miss work for his treatments, Lead Warehouse Associate Cesar Gonzalez, his subordinate, would be given work to perform by plaintiff so that Gonzalez could direct the warehouse workers in the completion of their daily tasks. Gonzalez was trained by plaintiff to cover for him when he had to miss work, and Gonzalez's training started in the beginning of 2017, before plaintiff was diagnosed with cancer. Prior to the end of August of 2017, Gonzalez would share an office with plaintiff, and if plaintiff took time off from work, Gonzalez would cover all of plaintiff's duties regarding day to day operations except attending manager meetings. No doubt that plaintiff's job duties changed after his cancer diagnosis and he would be assigned tasks that he previously did not perform, which plaintiff characterized as "operational support." Also, Gonzalez would take care of some of plaintiff's responsibilities to assist him during his treatments.

During the time of plaintiff's treatments from September through November of 2017, Jozefowicz noticed that plaintiff was missing time from work and, he stated that during several weeks, plaintiff only was working two days per week. However, plaintiff worked 35-46 hours per week from October

12

until his FMLA leave in late November of 2017. Jozefowicz also noticed that when plaintiff was at work he frequently appeared to be in pain, and it was clear that at these times, plaintiff was not able to perform his duties. Cogit also observed plaintiff with his head down on his desk at times. Plaintiff admitted that he was experiencing fatigue during this time due to his cancer and treatment. RLS "didn't fault [plaintiff] for any of this", and indicated it understood and could tell "he was struggling." Jozefowicz advised Cogit and Leo of these facts. Plaintiff tried to give RLS advance notice when he would have to miss work but he did not always do so, however, this did not prevent plaintiff from taking off all the time he needed.

As such, Plaintiff was instructed to see Cogit and she informed plaintiff if he needed additional accommodations, he should get a doctor's note and he could fill out paperwork so that RLS "could accommodate whatever it was he needed." Cogit also gave plaintiff FMLA paperwork and asked him if he wanted to apply for intermittent FMLA leave. However, plaintiff did not want to apply since he was saving his FMLA leave until his surgery.

During his treatment, RLS tried to make sure plaintiff's duties were covered when he was absent or unable to perform them so that plaintiff would not be pressured to complete them within a specific time period. Although

13

plaintiff testified that by the end of October of 2017, "things changed extremely drastically when [he] was just on the forklift all day", plaintiff was assigned tasks that he was cable of performing.

As part of his Senior Supervisor duties, plaintiff had to complete performance reviews for the employees he supervised in November of 2017.

On November 9, 2017, plaintiff sent an email to Jozefowicz, Cogit and Leo stating that he felt he was demoted with respect to his job duties and that he needed "clarity on [his] position and compensation." There is no dispute that plaintiff was not told by his supervisors at RLS that he was demoted and the reason why he believed he was demoted was because he felt his job duties had changed and that other employees had assumed some of his duties. In fact, Jozefowicz repeatedly assured plaintiff that he was not demoted and that some of his duties were temporarily reassigned to other employees, including Jozefowicz and Gonzalez, to accommodate him during his medical absences. Other RLS officials, including Goldstein, also repeatedly advised plaintiff that even though his job duties changed he was not demoted and, that both his pay and his title were not altered. Further, Goldstein told plaintiff that he was still a Senior Supervisor and that RLS would accommodate his medical restrictions, such as his inability to be in the

14

cold. Indeed, plaintiff admitted that his title as Senior Supervisor "never changed." Plaintiff also complained that his job was altered since he was advised that Gonzalez was running the day-to-day operations and that he should follow what Gonzalez instructed him to do. Plaintiff also states that he was being required to drive a forklift as part of his duties, but this was a job requirement of his position and his medical restrictions did not prevent him from operating one.

On November 10, 2017, Leo had a discussion with plaintiff about his email and repeatedly told plaintiff that he was not demoted and that management was trying to work with him to accommodate him, i.e., to have plaintiff tell them what he can do. Leo also discussed the issue of whether plaintiff was missing significant work time. Plaintiff claimed that he was working 50 hours per week and he was allowed to show how many hours per week he was working. Plaintiff indicated that if he had to clock in and out to track his time, it would reflect he was working 50 hours per week. Thus, beginning the week of November 13, 2017, plaintiff agreed that his pay status would be switched from salary to hourly. During this week, plaintiff worked 46.5 hours and he was paid time-and-a-half for overtime. In fact,

plaintiff made more money that week than his regular weekly salary. The next week plaintiff stopped working when he took FMLA leave.

After his discussion with plaintiff, Leo sent an email the same day to Jozefowicz, Cogit and Goldstein summarizing his conversation with plaintiff, including how RLS had accommodated plaintiff and was going to continue to accommodate him. Ds Ex. I. In his email, Leo also stated:

> [Plaintiff] has to punch in and out. His hourly pay should be his current salary divided by 50 hours. It should be exactly his salary divided by 50. He cannot work more than 50 hours- I told them both. No OT pay over 40. He asked if he works "close" to 50 hours what will we pay him, I told him he will get paid the number of hours he worked, let's say 49, multiplied by his hourly rate. (Doc. 51-13).

Leo also told plaintiff that in light of his constant complaining about his belief that he was demoted, which bordered on insubordination, he and RLS would have to "part ways" if he persisted.

Leo indicated that plaintiff's position would not change but that the supervisory reporting structure had to change to provide "clear direction" to the staff and customers, i.e., Gonzalez would direct the staff and forklift operators what to do when plaintiff was not able to work. Gonzalez would also give directions to plaintiff as he began to perform forklift work. However, Gonzalez was not promoted, rather the staff needed structure so they would

16

know who to report to when plaintiff was not present. Plaintiff would also assist RLS with key projects until he was able to return to full duty.

On November 15, 2017, plaintiff sent an email to Goldstein claiming that his job duties changed to performing a majority of desk work and light lifting, but later admitted that his job did not change in that respect and that he was only doing desk duty "maybe half the time."

5. FMLA Leave

Plaintiff started to take his 12-week FMLA leave on November 24, 2017, in advance of the surgery he needed as part of his cancer treatment. Plaintiff's surgeon, Dr. Barry Pernikoff, issued a note on November 30, 2017, indicating that plaintiff was "unable to work as of 11/24/17 Joseph is to be out of work starting 11/24/17, due to the work conditions."

Thus, plaintiff began his continuous FMLA leave on November 24, 2017, pursuant to Dr. Pernikoff's note that plaintiff was "totally incapacitated" from November 24, 2017 to "undetermined."

During this time when his continuous FLMA leave began, plaintiff also applied for short-term disability ("STD") benefits since he was going to be out of work due to his surgery. Plaintiff admitted that he did not apply for STD due to any change in his job duties.

17

Plaintiff and Cogit dispute whether she provide him with FMLA paperwork. Nonetheless, plaintiff was granted FMLA leave and beginning on November 24, 2017, he used the entire 12 weeks of FMLA leave to which he was entitled. Plaintiff used up his 12-week FMLA leave on February 15, 2018, and he tried to return to work at RLS on February 16, 2018, with limitations.

6. STD Benefits

Plaintiff's application for STD benefits was accepted and he received $3,900 per month from his private STD carrier (Mutual of Omaha Insurance Company) from January 1, 2018 through December 31, 2018. (*See* Doc. 57, filed under Seal). During this 12-month period, plaintiff's doctor, oncologist Bruce Saidman, indicated that plaintiff was unable to work in any capacity.

During the 2018 year when plaintiff's doctor indicated that he was unable to work, Dr. Saidman submitted periodic Supplementary Statements to plaintiff's STD carrier. In his first supplement on January 19, 2018, Dr. Saidman indicated that plaintiff would be unable to work from November 24, 2017 through April 1, 2018.

On March 9, 2018, Dr. Saidman submitted another Supplementary Statement indicating that plaintiff would be unable to work from November

18

24, 2017 through September 1, 2018, noting "(minimal–date is indeterminable, this is just an estimate)."

On August 20, 2018, Dr. Saidman submitted another Supplementary Statement to plaintiff's STD carrier indicating that plaintiff would be unable to work through October 31, 2018, since he was recovering from his June 26, 2018 surgery.

Finally, on November 30, 2018, Dr. Saidman submitted another Supplementary Statement indicating that plaintiff would be unable to work through December 31, 2018.

In all of his Supplementary Statements, Dr. Saidman listed plaintiff's restrictions as "[Activities of Daily Living] only as tolerated while recovering & receiving treatment."

7. Prior to Plaintiff's Return to Work

Prior to his return to work after being granted 12-weeks of FMLA leave, plaintiff emailed RLS a note from Dr. Saidman dated February 6, 2018, which restricted plaintiff's work to a maximum of 50 hours per week, to allow him to leave work every other Friday for chemotherapy treatment, and stating that "[plaintiff] should not have extended exposure to cold climates."

19

On February 14, 2018, plaintiff sent an email to RLS explaining Dr. Saidman's work restriction regarding cold climates and stating that his "[doctor] understands that I may have to spend 1-2 hours total per shift in the freezer, and he has released me to do that." However, plaintiff's email revealed that he incorrectly advised his doctor that he worked primarily at a desk as a Senior Supervisor and that he only spent 1-2 hours in the freezer during a 10-12 hour shift.

Cogit emailed plaintiff back on February 14, 2018, prior to his return from FMLA leave, and stated:

> As per the guidelines of the FMLA we will do our best to return you to an equivalent position however that may not be possible with the restrictions that your doctor has provided [i.e., restricting plaintiff from extended exposure to cold climates]. As you know, we operate a cold storage facility and your position supervising operations in that facility requires a large amount of time in the freezer, so limited exposure to a cold climate as stated in your doctor's note is not possible. You should report to Bill and/or Shane Morgan, the warehouse manager. We will discuss your restrictions and if we can find a way to accommodate them upon your return on Friday, 2/16/18.

8. The Interactive Process to Accommodate Plaintiff

When plaintiff was to return to RLS for work, it was decided that he would be the inventory management person and manage key inventory within his same position as Senior Supervisor. Managing inventory was part of plaintiff's job before he became sick and he had to ensure that inventory

20

was maintained properly, including supervising the team in freezers as they dealt with frozen food products. Plaintiff also supervised customer audits before he became sick, which involved auditing inventory. However, plaintiff could not supervise his team in the freezer after his illness due to his own doctor's restrictions, and he could not perform this part of his position. Thus, RLS was going to assign plaintiff to manage inventory for a particular customer in Building 2 on its campus, which was the smallest building and had only one dock and two freezer rooms. This alleviated the need for plaintiff to walk and drive among the three buildings on the campus as he previously was required to do. RLS made the change in plaintiff's job duties to accommodate him since it was a "slower introduction back into the work force" and since "his skill set and his knowledge of [the] customer was of value to [RLS]."

Plaintiff alleged that Jozefowicz told him the inventory management job he was offered involved being in a freezer for 60 percent of the day, auditing inventory and counting pallets. Plaintiff alleges that he could not perform the new duties defendants assigned him since he believed that it was not medically safe for him to be in the freezer for this amount of time. However, the record shows that Cogit informed plaintiff in an email that, "You are

21

required to be in the freezer to supervise and guide the employees as well as complete your own assigned tasks for a minimum estimation of half of your shift times which [Jozefowicz] discussed with you this morning." Cogit did not indicate that plaintiff's other assigned tasks he would be required to perform during half of his shift, in addition to supervising staff in the freezer, would also involve being in the freezer.

9. Plaintiff Returns to Work

Plaintiff returned to work at RLS on February 16, 2018, after using his 12-week FMLA leave. Plaintiff met with Jozefowicz and Cogit, and he was advised that RLS was going to have him manage inventory and that his title remained Senior Supervisor. Also, plaintiff was being assigned to work in only one of the buildings, which had two bathrooms he could use, instead of being required, as he previously was, to travel between the three buildings that were spread out on RLS's campus. Plaintiff's salary remained the same at $1,350 per week that it was before his FMLA leave. Plaintiff did not remember if he asked Jozefowicz to explain his new job duties as inventory manager. During the meeting, Jozefowicz and Cogit did not tell plaintiff that anyone filled his Senior Supervisor position during his absence, including Mr.

22

Taraszewski, and they did not indicate that plaintiff's position was no longer available.

However, plaintiff thought he was "to come back to do the same exact job that [he] was doing [before his illness]." Plaintiff stated that he did not expect to be managing inventory when he returned to work as a Senior Supervisor. Specifically, he stated:

> I expected to get to do the job that I was doing before, managing the workload, giving guys work, handing out work, dealing with the truck loads, not managing inventory the whole time. That was my expectation. That's the job title I left with, to come back to do the same exact job that I was doing. That was my expectations, anyway.

Thus, plaintiff did not make any effort on the day he returned to RLS to perform the inventory management duties that were assigned to him. Nor did plaintiff do any work for RLS that day. Rather, plaintiff walked off the job at RLS and he admitted that no one fired him or terminated his employment.

Later on February 16, 2018, plaintiff sent an email to Cogit stating that "there is no position available to me at RLS, and I will not be returning to RLS at this time." Cogit then replied in an email to plaintiff stating that RLS returned him "to [his] same position and pay as we clarified several times during our meeting [in the morning of February 16, 2018]." Cogit also stated

23

that she was informed that plaintiff "walked off the job as [he] was not happy with the tasks [he] was assigned by [his] manager [Jozefowicz] to complete."

RLS thought that it was making a good faith effort to accommodate plaintiff when he returned to work by having him mange the inventory, which was already part of his job, and to alleviate the need for plaintiff to be in the freezers for extended periods of time. Indeed, plaintiff admitted that previously as Senior Supervisor he had to enter freezers at least half of his day in addition to performing other tasks which did not require him to be in the freezers.

In her deposition, Cogit testified that "[had plaintiff not walked out, there is not a doubt in my mind that we would have done everything we would have to accommodate whatever [plaintiff] needed." In fact, Cogit indicated that if plaintiff did not walk off the job, he would still be employed at RLS.

## III.    DISCUSSION

Plaintiff alleges that RLS failed to return him to the duties of his Senior Supervisor position after he returned to work from his 12-week FMLA leave, taken while he was being treated for colon cancer, based on his known disability in violation of the ADA. Plaintiff contends that he was qualified for his Senior Supervisor position and that he could performed all of the essential

24

duties of this position but that RLS changed his duties requiring him to do work that it knew was prohibited by his condition. Plaintiff also alleges that RLS failed to accommodate his disability and that it retaliated against him. Further, plaintiff claims that RLS interfered with his FMLA leave and retaliated against him for taking it.

The defendants argue that they are entitled to summary judgment in this disparate treatment case because the plaintiff has not offered sufficient evidence to prove that their actions discriminated against him because of his disability, and that there is no evidence showing that they failed to accommodate him. The defendants also contend that plaintiff is not a qualified individual under the ADA and that he was not able to perform the essential functions of his Senior Supervisor position, with or without accommodation. The defendant also maintain that they accommodated plaintiff's condition by changing his job duties to allow him to keep working and by assigning him inventory management duties that did not require him to go into the freezers as much as he previously did and travel throughout its campus. The defendants also argue that there is no merit to plaintiff's retaliation claims since they did not take any adverse actions against him and they never changed his title or his salary. Additionally, the defendants

state that plaintiff was not terminated and that he chose to quit when he was dissatisfied with his new job duties. Further, the defendants point out that plaintiff cannot succeed on his FMLA claims since he was allowed the entire 12-week period of leave and since they offered to reinstate plaintiff to his same job title and pay even though he could not perform all of the duties of his position due to the restrictions his own doctor imposed.

The court will first address whether plaintiff's Declaration, (Doc. 51-1), should be precluded based on the Sham Affidavit Doctrine as RLS contends.

### 1. Sham Affidavit Doctrine

A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant. *See* Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986). Liberty Lobby specifically recognizes the trial judge's power to grant summary judgment on disputed records. (Id. at 251). Therefore, if it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate.

It's Intoxicating, Inc. v. Maritim Hotelgesellschft mbH, 2015 WL 1275348, at *2 (M.D. Pa. Mar. 19, 2015) (quoting Jiminez v. All-American Rathskeller, Inc., 503 F.3d 237, 253 (3d Cir. 2007)).

Although the sham affidavit doctrine allows the court to disregard an "affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony", Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004), "not all contradictory affidavits are necessarily shams[,]" Jiminez, 503 F.3d at 254 (citing Baer, 392 F.3d at 625), and "an affiant has the opportunity to offer a 'satisfactory explanation' for the conflict between the prior deposition and the affidavit." Id. (citing Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991)). Moreover, disregarding statements in an affidavit is appropriate only on "clear and extreme facts", such as when the affidavit is "flatly contradictory" to the prior testimony. Coleman v. Cerski, 2007 WL 2908266, at *5 (M.D. Pa. Oct. 4, 2007) (citing Videon Chevrolet, Inc. v. Gen. Motors Corp., 992 F.2d 482, 488 (3d Cir. 1993)).

"The timing of the affidavit, whether there is a plausible explanation for the contradictory statements, and whether there is independent evidence in the record supporting the affidavit, may be considered when determining whether an affidavit is a sham." J.R. v. Lehigh Cnty., 534 Fed.Appx. 104, 108 (3d Cir. 2013) (citing EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 268-69 (3d Cir. 2010)).

27

In reviewing plaintiff's deposition testimony and comparing it to his later Declaration, the court finds that his Declaration should be stricken in its entirety under the Sham Affidavit Doctrine. Plaintiff was deposed on March 28, 2019 and his Declaration was signed February 12, 2020, almost one year later. "The main practical reason supporting the sham affidavit doctrine is that prior depositions are more reliable than affidavits." Jiminez, 503 F.3d at 253. Plaintiff, who was represented by counsel, had the full opportunity to explain all of his answers to defendants' questions in his deposition and to state the bases for all of his claims. However, to try and dispute many of the facts stated in RLS's statement of material facts that are supported by the record, plaintiff attempts to rely upon his subsequent Declaration, as opposed to other evidence in the record. Plaintiff's averments in his Declaration lack support in the evidence in the record and are largely based on his own unsubstantiated allegations. Also, as RLS argues, plaintiff's Declaration materially contradicts his deposition testimony with respect to several key issues in this case and plaintiff offers no satisfactory explanation for his contradictions. (*See* Doc. 55 at 14-15). Significantly, plaintiff attempts to create issues of material fact in his Declaration regarding the essential functions of his job when his deposition testimony is directly contradictory,

28

such as his averment that his Senior Supervisor job was a desk job he performed mainly in a heated office when in fact his job largely entailed supervising his team members while they worked in the freezers. Further, RLS had no opportunity to cross exam plaintiff regarding his averments in his Declaration and his attempt to belatedly try and explain his deposition testimony in his Declaration will not be permitted.

Further, many of plaintiff's averments in his Declaration contradict his deposition testimony and try to explain things which he could have explained during his deposition. Also, as RLS points out, plaintiff's Declaration contains hearsay statements which are inadmissible, as well as hearsay within hearsay. (*See* plaintiff's Declaration, Doc. 51-1, at Paragraphs 5, 11, 16, 17, 24-26, 32, 40-42, 45-47). It is well established that "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D. N.J. 1995). This rule is particularly applicable to parties who attempt to rely upon hearsay statements to establish material issues of fact in order to preclude summary judgment. Regarding such claims, "[i]n this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial." Shelton v. University of

Medicine & Dentistry of N.J., 223 F.3d 220, 223, n. 2 (3d Cir. 2000) (citation omitted). "[A] party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay." Damiano v. Scranton Sch. Dist., 2016 WL 3227254, *3 (M.D. Pa. June 13, 2016) (citations omitted). "It is not the burden of the court, but the plaintiff, to identify which hearsay exceptions apply to each of the combined statements provided by the plaintiff in her affidavit." Id. Here, the plaintiff has failed to identify any exceptions applicable to his hearsay averments in his Declaration and they will not be considered regarding RLS's motion for summary judgment.

As such, the court finds numerous direct contradictions between plaintiff's deposition testimony and his Declaration, as well as hearsay averments in his Declaration, and plaintiff's entire Declaration will not be considered.

## 2. ADA Claims

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42

U.S.C. §12112(a). To establish a prima facie case of disability discrimination under the statute, the plaintiff must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination [and because of his disability]." Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999) (citing Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998)). The ADA defines a "disability" with respect to an individual as: "(a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such impairment; or (c) being regarded as having such an impairment." 42 U.S.C. §12102(1).

The ADA Amendments Act of 2008 ("ADAAA") expanded the scope of disability and construed the definition of disability in favor of broad coverage. *See* Kieffer v. CPR Restoration & Cleaning Service, LLC, 200 F.Supp.3d 520, 533-34 n.9 (E.D. Pa. 2016) (court noted that the ADAAA lowered the standard for finding a disability under the ADA).[4] Further, in order to establish

---

[4]The court notes that the Pennsylvania legislature has failed to enact amendments to the PHRA similar to the ADAAA. Bielich v. Johnson & Johnson, Inc., 6 F.Supp.3d 589 (W.D. Pa. 2014). As such, courts have

a prima facie case of disability discrimination under the ADAAA, the burden remains on a plaintiff to establish a causal nexus between his disability and the adverse employment action. Jakomas v. City of Pittsburgh, 342 F.Supp.3d 632, 650 (W.D. Pa. 2018).

Here, there is no dispute by RLS that plaintiff's colon cancer qualified as a "disability" under the ADAAA. Rather, RLS argues that plaintiff cannot establish a prima facie case because he was not otherwise qualified for his Senior Supervisor job since he could not perform the essential functions and he did not suffer any adverse employment actions because of his disability.

The court will now discuss the plaintiff's ADA claims in the context of the burden-shifting framework set forth in McDonnell Douglas Corp.v. Green, 411 U.S. 792 (1973).

The burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to the plaintiff's disability discrimination claims under the ADA and the PHRA, in cases, like the instant one, where the plaintiff relies on circumstantial evidence. See Gavurnik v. Home Properties, L.P., 227 F.Supp.3d 410, 416 (E.D. Pa. 2017), aff'd. 712 Fed.Appx. 170 (3d

---

applied the pre-ADAAA meaning of disability to PHRA claims. See Showers v. Endoscopy Ctr. of C. Pennsylvania, LLC, 58 F.Supp.3d 446, 461-62 (M.D. Pa. 2014).

Cir. 2017); <u>Williams v. Phil. Hous. Auth. Police Dept</u>., 380 F.3d 751, 760 (3d Cir. 2004) (citation omitted); <u>Wells v. Retinovitreous Associates, Ltd.</u>, 702 Fed.Appx. 33, 35 (3d Cir. 2017).

In <u>Howell</u>, 283 F.Supp.3d at 323, the court detailed the three-part burden-shifting framework as follows:

> the plaintiff must first produce evidence sufficient to convince a reasonable factfinder as to all of the elements of a prima facie case of discrimination. <u>Kautz v. Met–Pro Corp</u>., 412 F.3d 463, 465 (3d Cir. 2005). If a plaintiff establishes a prima facie case, "the burden of production (but not the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that the defendant had a legitimate, nondiscriminatory reason for the adverse employment decision." *Id.* (internal citations and quotations omitted). An employer need not prove, however, that the proffered reasons actually motivated the employment decision. *Id.* If a defendant satisfies this burden, a plaintiff may then survive summary judgment by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Id.*

*See also* <u>Smith v. City of Allentown</u>, 589 F.3d 684, 689 (3d Cir. 2009).

The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Williams</u>, 380 F.3d at 759 n. 3.

"The burden to establish a prima facie case is a not an onerous one, but a prima facie case can allow a court 'to eliminate the most obvious, lawful

33

reasons for the defendant's action.'" Decker v. Alliant Technologies, LLC, 871 F.Supp.2d 413, 425 (E.D. Pa. 2012) (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999).

"To have a successful prima facie case of disability discrimination, retaliation, or failure to accommodate under the ADA, Plaintiff must establish that []he is a "qualified individual." Weiss v. PA Hosp. of Univ. of PA, 2021 WL 780307, *6 (E.D. Pa. Feb. 26, 2021). Under the ADA, a qualified individual with a disability is a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." §12111(8). An employee is a qualified individual if he satisfies the following requirements: (1) "[that he] has the requisite skill, experience, education and other job-related requirements" and (2) "[that] with or without reasonable accommodation, [he] can perform the essential functions of that position." Turner v. Hershey Chocolate U.S., 440 F.3d 604, 612 (3d Cir. 2006) (citing 29 C.F.R. §1630.2(n)). "[T]he plaintiff bears the burden of proving that []he is otherwise qualified; if an accommodation is needed, the plaintiff must show, as part of h[is] burden of persuasion, that an effective accommodation exists

that would render h[im] otherwise qualified." <u>Walton v. Mental Health Ass'n.</u> <u>of Se. Pennsylvania</u>, 168 F.3d 661, 670 (3d Cir. 1999) (citation omitted).

As the court in <u>Gavurnik</u>, 227 F.Supp. 3d at 417, explained:

"Essential functions" refers to the "fundamental job duties of the employment position," not "the marginal functions of the position." 29 C.F.R. §1630.2(n)(1). A function is essential if "the reason the position exists is to perform that function." §1630.2(n)(2)(i). The relevant regulation looks to evidence of the employer's judgment, written job description, consequences of not performing the function, and current work experience of incumbents to determine if a function is essential. §1630.2(n)(3). "Whether a function is essential is evaluated on a case-by-case basis...." <u>Davis v. Fla. Power & Light Co.</u>, 205 F.3d 1301, 1305 (11th Cir. 2000).

The evidence clearly shows that plaintiff is a disabled person under the ADAAA as well as under the pre-ADAAA standard. The evidence also shows that plaintiff had the necessary skill, experience, and education to perform the Senior Supervisor job.

"[T]he employer has the burden of showing a particular job function is an essential function", and "Courts [generally] grant a 'significant degree of deference to an employer's determination as to what functions are essential.'" <u>Weiss</u>, 2021 WL 780307, *7 (internal citations omitted). "Courts should also consider evidence of the employer's actual practices in the workplace", and "Courts must 'consider the position for which an employee was hired ….'" *Id*. (internal citations omitted).

35

Defendants contend that plaintiff has failed to establish a prima facie case of disability discrimination since he was not a qualified person for the Senior Supervisor position based on the undisputed fact that he was not capable of performing the essential functions of this job even with accommodations. Specifically, defendants contend that the plaintiff could not perform the essential functions of the Senior Supervisor position to work at least a majority of his time in the freezers checking on the work of his numerous subordinates with temperatures well below 32 degrees Fahrenheit and on loading docks at or below 32 degrees Fahrenheit. No doubt that plaintiff was promoted to the Senior Supervisor position to supervise warehouse associates who largely worked in the freezers since RLS's business was to store frozen products for its customers. Working in a heated office was not a large part of plaintiff's Senior Supervisor job. Plaintiff admitted that he had to leave work a week before his scheduled surgery since the "cold was a problem for [him]." Due to the extreme cold in the freezers, plaintiff began to have his subordinate give assignments to the warehouse workers when he was absent or unable. In fact, at the end of October of 2017, plaintiff was not capable of doing many of the essential functions of his Senior Supervisor job. Plaintiff's doctor limited him from

"extended exposure to cold climates" which would not allow him to conduct the required inventory/audits and walk-throughs in the freezers. As defendants state, "[i]t was simply not possible for Plaintiff, in his capacity as Senior Supervisor, to supervise his team without being in the freezers." Nor can it be ignored that plaintiff's own doctor indicated that plaintiff was totally disabled from working during the entire 2018 year and plaintiff received total disability benefits of $3,900 per month through his private STD carrier during the complete 2018 year. *See* Ehnert v. Wash. Penn Plastic Co., Inc., 783 Fed.Appx. 175, 177-78 (3d Cir. 2019) (holding an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of earlier representations made for a Social Security Disability Insurance total disability claim, but must proffer a sufficient explanation that reconciles the inconsistent statements); Detz v. Greiner Indus., Inc., 346 F.3d 109, 118-21 (3d Cir. 2003). No doubt that the stated facts strongly contradict plaintiff's instant claim that he was qualified for the Senior Supervisor position and was able to perform the essential functions of the job for purposes of his ADA claims.

In this case, the court finds that there are no genuine issues of material fact that plaintiff was not qualified for the Senior Supervisor position based on the evidence detailed above that was presented in the case. Since the

court provided an extensive rendition of the evidence above, as well as the disputed material facts, it does not repeat it. In short, defendants presented more than sufficient evidence that plaintiff was not able to do some of the essential functions of the Senior Supervisor position. Plaintiff failed to present admissible evidence to show that he was in fact capable of performing all of the major duties of the Senior Supervisor position and failed to show that these duties were largely performed in a heated office as opposed the sub-freezing freezers. In fact, plaintiff admitted that he did not work "primarily at a desk" as Senior Supervisor.

As indicated above, the plaintiff has been precluded under the Sham Affidavit Doctrine from relying on his own self-serving averments in his Declaration, which, for the most part, contradict his sworn deposition testimony and are not supported by the record, to try and show that he could perform the essential duties of the Senior Supervisor position. Further, plaintiff fails to explain how he could perform the essential functions of his Senior Supervisor job when he told RLS that his own doctor restricted him to only 1-2 hours in the freezer per shift.

Thus, in construing the facts in a light most favorable to the plaintiff, the

court finds that plaintiff has failed to establish a prima facie case regarding his disability discrimination, retaliation and failure to accommodate claims under the ADA since there are no factual disputes that he was not qualified to work in the Senior Supervisor position. *See* Gavurnik, 227 F.Supp. 3d at 418. *See also* Weiss, 2021 WL 780307, *7 ("If Plaintiff cannot show that she could perform the essential functions of her job with or without reasonable accommodation at the time of termination, her prima facie case fails.") (citations omitted).

Since plaintiff failed to present sufficient evidence to support a reasonable jury finding that he could perform the essential functions of his Senior Supervisor job at the time he left RLS, defendants are entitled to summary judgment on his ADA disability discrimination, retaliation and failure to accommodate claims, Counts Four, Five and Six.

### 3. FMLA Interference Claim

Plaintiff raises an FMLA interference claim. To state an FMLA interference claim, plaintiff must establish: (1) he was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his intention to take FMLA leave; and (5) the

plaintiff was denied benefits to which he was entitled under the FMLA. Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014) (citing Sommer v. The Vanguard Grp., 461 F.3d 397, 399 (3d Cir. 2006) (noting that an interference claim requires an employee to show that he was not only entitled to FMLA benefits but that he was denied those benefits)). "Under an interference claim, 'the employee need not show that he was treated differently than others[, and] the employer cannot justify its actions by establishing a legitimate business purpose for its decision.'" *Id*. at 192 (citation omitted). Further, "[b]ecause the FMLA [interference claim] is not about discrimination, a *McDonnell Douglas* burden-shifting analysis is not required." *Id*.

Here, the evidence shows that plaintiff met the first, third, and fourth elements of his FMLA interference claim, i.e., he was an eligible employee under FMLA, that he was entitled to FLMA leave, and he gave notice of his intention to take FMLA leave. At issue is the fifth element, i.e., whether plaintiff showed that he had been denied benefits to which he was entitled under FMLA. As indicated, plaintiff began his 12-week FMLA leave on November 24, 2017, when Dr. Pernikoff opined that plaintiff was "totally incapacitated" from November 24, 2017 to "undetermined." The undisputed evidence shows that plaintiff received all of the benefits to which he was

40

entitled by taking the full 12-weeks of FMLA leave, and no FMLA benefits were withheld. Further, when plaintiff returned to RLS on February 16, 2018, he retained the same Senior Supervisor position he had before his FMLA leave and the same salary. It is of no moment that plaintiff did not like his new duties regarding inventory management assignment since he has not shown that his FMLA benefits were anyway withheld by RLS. As such, plaintiff has failed to establish the fifth element of his FMLA interference claim, and he has failed to make a prima facie showing of interference. *See* Ross, 755 F.3d at 192 (Third Circuit has "made it plain that, for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld."). The court need not address the third prong, i.e., whether RLS was liable as an "employer" under the FMLA, since plaintiff failed to establish a prima facie showing of interference. *See id.*

Thus, defendants will be granted summary judgment with respect to plaintiff's FMLA interference claim, Count One.

### 4. FMLA Retaliation Claim

Plaintiff also claims that defendants retaliated against him for taking his FMLA leave by not assigning him the same duties he previously had as Senior Supervisor when he returned to work. "To succeed on an FMLA

41

retaliation claim, a plaintiff must show that "(1) [ ]he invoked h[is] right to FMLA-qualifying leave, (2) [ ]he suffered an adverse employment decision, and (3) the adverse action was causally related to h[is] invocation of rights." Ross, 755 F.3d at 193 (citation omitted).

The Third Circuit has held that the burden-shifting framework established in McDonnell Douglas must be used to address FMLA retaliation claims based on circumstantial evidence. *See id*. "Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of discrimination." *Id*.

As discussed above, plaintiff has failed to establish a prima face case of discrimination. Plaintiff has also failed to show that he suffered any adverse employment decision after he invoked his right to take 12-weeks of FMLA leave since he returned to the same Senior Supervisor position and the same salary.

Thus, defendants are entitled to summary judgment on plaintiff's FMLA retaliation claim, Count Two.

## 5. PHRA Claims

Because the plaintiff has not established a prima facie case regarding his discrimination, retaliation and failure to accommodate claims under the

42

ADA, and since the same standard applies to plaintiff's identical claims under the PHRA he raises in this case, the defendants are also entitled to summary judgment on his state law claims as well, Counts Seven, Eight and Nine. *See* Tielle v. The Nutrition Group, 2019 WL 3801552 (M.D. Pa. Aug 13, 2019), aff'd. 810 Fed.Appx. 160 (3d Cir. 2020); Willis, 2 F.Supp.3d at 604 n. 10 ("Courts within this Circuit interpret the ADA and PHRA coextensively.").

### 6.    IIED Claim

Finally, considering judicial economy, convenience and fairness to the litigants, the district court in its discretion is permitted to decline the exercise of supplemental jurisdiction over state law claims if the court has dismissed all of the claims over which it had original jurisdiction. Kach v. Hose, 589 F.3d 626, 650 (3d Cir. 2009) (citations omitted). *See* Patel v. Meridian Health System, Inc., 666 Fed.Appx. 133, 136 (3d Cir. 2016) ("A district court 'may decline to exercise supplemental jurisdiction' over state law claims if it 'has dismissed all claims over which it has original jurisdiction[,]' unless considerations of judicial economy, convenience, or fairness to the parties provide an affirmative justification for exercising supplemental jurisdiction."). The court has made the appropriate considerations and finds no extraordinary circumstances exist in this case to exercise supplemental

jurisdiction over plaintiff's remaining Pennsylvania IIED claim raised in Count Three of his SAC. Since plaintiff's federal claims over which this court had original jurisdiction shall not be permitted to proceed to trial, the court, in its discretion, declines to exercise supplemental jurisdiction over plaintiff's state law IIED claim, against defendants. *Id*.; *see also* 28 U.S.C. §1367(c)(3); Kocher v. Municipality of Kingston, 400 F.Supp.3d 138, 160 (M.D. Pa. 2019).

As such, plaintiff's state law IIED claim shall be dismissed without prejudice. Kach, 589 F.3d at 650 ("If a district court decides not to exercise supplemental jurisdiction and therefore dismisses state-law claims, it should do so without prejudice, as there has been no adjudication on the merits.") (citation omitted).

## IV.    CONCLUSION

Based on the foregoing reasons, since the plaintiff has not demonstrated a prima facie case, the defendants are entitled to summary judgment as to the plaintiff's disability discrimination, retaliation and failure to accommodate claims under the ADA and the PHRA. The defendants are also entitled to summary judgment as to plaintiff's FMLA claims. The court declines to exercise supplemental jurisdiction over plaintiff's state law IIED

claim since defendants are entitled to summary judgment with respect to all of plaintiff's federal claims. An appropriate order shall issue.



s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**


**Date: March 18, 2021**
18-997-01

45